**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| AMANDA VO, individually and on behalf of a putative class, | |
| *Plaintiff,* | Hon. Charles P. Kocoras |
| v. | Case No. 19-CV-07187 |
| VSP RETAIL DEVELOPMENT HOLDING, INC., a Delaware corporation, | |
| *Defendant.* | |

## MOTION TO DISMISS PLAINTIFF'S COMPLAINT WITH PREJUDICE

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant VSP Retail Development Holding, Inc. ("VSP") moves to dismiss the class action complaint filed by Plaintiff Amanda Vo ("Plaintiff") on September 27, 2019.  *See* Pl.'s Class Action Complaint ("Compl."), ECF No. 1-1 (removed Oct. 31, 2019).  In support hereof, VSP states as follows:

## I.  INTRODUCTION

Although Plaintiff's complaint alleges that VSP provides an internet-based "Virtual Try On" tool for retail eyewear that purportedly fails to provide certain warnings under the Illinois Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1 *et seq*., Plaintiff's cause of action under BIPA is expressly preempted by the federal Health Insurance Portability and Accountability Act of 1996 ("HIPAA").  Pub. L. No. 104-191, 110 Stat. 1936 *et seq*.  HIPAA authorizes a "provider of services" (such as VSP) to collect and hold both biometric identifiers and full-face photographic imagery for the purposes of healthcare treatment, payment, or business operations.  HIPAA also includes extensive regulations covering the processes that a "provider of services" must follow to receive such information, which are exempt from the proscriptions of BIPA.

At the same time, the "Terms of Use" governing VSP's website (www.eyeconic.com) expressly condition the use of the site (and thus the use of the "Virtual Try On" tool) on the waiver of all claims and causes of action against VSP. In addition, the "Terms of Use" contain an integrated "Privacy Notice" explaining that the "Virtual Try On" tool is owned and operated by a third party – Ditto Technologies, Inc. ("Ditto") – and that it is Ditto (not VSP) that collects information through the "Virtual Try On" application. VSP's "Privacy Notice" requires the consumer to agree that VSP will not be responsible for the collection of such information by Ditto or any third party. The "Privacy Notice" also advises that any data provided to Ditto is subject to *that* company's privacy and security policies, which are linked from VSP's "Privacy Notice" and are also BIPA-compliant. For each of these reasons, the Court should dismiss Plaintiff's complaint in its entirety and with prejudice under Federal Rule of Civil Procedure 12(b)(6).

## II. FACTS RELEVANT TO THE PRESENT MOTION TO DISMISS

VSP is a Delaware healthcare company that markets and sells both corrective eyewear and contact lenses (among other medical products). *See* Compl. ¶ 3. The company (which does business under the name "Eyeconic") is both a "covered-entity" under HIPAA, *see* 45 C.F.R. § 160.103, and a "provider of services" under the statute. *See* 42 U.S.C. § 1395x(u). By law, these designations authorize VSP to receive and retain any protected health information ("PHI") that is collected for the purposes of healthcare treatment, payment, or operations. *See* 45 C.F.R. § 164.306(a)(1). Under HIPAA, PHI includes both "biometric identifiers," *see* 45 C.F.R. §164.514(b)(2)(i)(P), and "full face photographic images." *See* 45 C.F.R. §164.514(b)(2)(i)(Q). While the complaint notes that VSP also sells non-prescription eyewear, *see* Compl. ¶ 3, this distinction is of no moment. Indeed, non-prescription eyewear is treated as a therapeutic ophthalmic device by the United States Food and Drug Administration, *see* 21 C.F.R. § 886.5850,

and is thus subject to HIPAA if captured by a "provider of services" as part of a full-face photographic image. *See* 45 C.F.R. §164.514(b)(2)(i)(Q).

VSP's website ([www.eyeconic.com](www.eyeconic.com)) is the primary means by which the company advertises and markets the various brands of retail eyewear that are sold to online consumers. *See* Compl. ¶ 17. When accessing the site, customers are given a several menu options; however, at the bottom of each page of the website is a black marquee or "overlay" that contains a contrasting white hyperlink map of the site. *See* Eyeconic.com (Image Capture), [https://www.eyeconic.com](https://www.eyeconic.com) (last visited Dec. 3, 2019) (attached as Exhibit A).[1] Featured on the black marquee are both the "Terms of Use" and the "HIPAA Privacy Policy" that enumerate the conditions for using the site. *See id*. As noted above, *these two hyperlinks appear on every page or navigable location accessible on the VSP website. See id*.

A.      **The "Terms of Use" Waive All Claims and Causes of Action Against VSP**

VSP's "Terms of Use" govern all consumer interaction with the company's website. The "Terms of Use" advise that if customers do not agree to be bound by the terms and conditions in their entirety (or as modified), they are not authorized to use the website and should exit immediately. *See* Eyeconic Terms of Use ¶ 1, [https://www.eyeconic.com/terms.html](https://www.eyeconic.com/terms.html) (last visited Dec. 3, 2019) (attached as Exhibit B). The "Terms of Use" also explain that by accessing the website or by using any of the site's current or future services (such as the "Virtual Try On" tool),

---

[1]      The Court may consider the information appearing on VSP's website without converting this motion to dismiss into a motion for summary judgment under Rule 12(d). In deciding a motion to dismiss under Rule 12(b)(6), a court may consider documents attached by the defendant "if they are referred to in the plaintiff's complaint and are central to his claim." *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (quoting *Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994)). Here, Plaintiff's complaint refers to VSP's website and online applications in multiple paragraphs, *see* Compl. ¶¶ 3, 5, 6, 16, 17, 18, 19, 20, 21, and 43, and the "Virtual Try On" tool connected to VSP's website is the principal basis on which Plaintiff attempts to assert liability under BIPA. As such, the Court can review and consider information appearing on VSP's website without converting the present motion to dismiss into a motion for summary judgment. *See Brownmark Films*, 682 F.3d at 690.

consumers agree they have "read, understand, and accept to be bound by these Terms of Use." *Id*.

VSP reserves the right to modify the "Terms of Use" and provides contact information for online

customers who have "questions, comments, or complaints" regarding any aspects of the site. *Id*.

Importantly, the "Terms of Use" also limit the rights of consumers in several ways. First,

the "Terms of Use" contain an all-capitalized "Limitation of Liability" paragraph that requires

consumers to waive any and all claims or causes of action against VSP. *See id*. ¶ 11. This

voluntary waiver applies to "indirect," "special," "incidental," "consequential," "punitive," or any

other form of damages or losses occurring from the use of (or access to) the site or its "service[s],"

"products," "information," or "functionalit[ies]," whether arising from "fault," "tort,"

"negligence," "strict liability," or "misrepresentation." *Id*. In addition, the "Terms of Use" require

customers to "defend, indemnify, and hold harmless" VSP from "all liabilities, claims and

expenses, including without limitation attorneys' fees" that arise from their use of the site or any

"services, information, or products" on the site. *Id*. ¶ 13. Basic utilization of the site provides the

requisite consent to be bound by the waiver language contained in these paragraphs. *See id*. ¶ 1.

**B.** **The "Terms of Use" Waive All Claims for the Actions of Third Parties**

The "Terms of Use" also caution that VSP's website may link to external websites and

applications that are not under the control of VSP. *Id*. ¶ 8. In such circumstances, users of the

website agree that VSP assumes no responsibility or liability for the actions, products, or content

of any of these third-party applications. *See id*. If consumers decide to access any third-party sites

or applications linked to VSP's website, they do so "entirely at [their] own risk." *Id*. VSP's waiver

language goes on to say that "in no event will [VSP] be held responsible or liable, directly or

indirectly, for any loss or damage caused or alleged to have been caused in connection with the

use of any external website." *Id*. As before, authorized use of the site by consumers provides

consent to be bound by the waiver language contained in this paragraph. *See id*. ¶ 1.

**C.      The "Privacy Notice" Advises the "Virtual Try On" Tool Does Not Belong to VSP**

Expressly incorporated into VSP's "Terms of Use" is a "Privacy Notice" that is available to customers by hyperlink directly from the "Terms of Use." *See id*. ¶ 9.  This hyperlink appears in a section of the "Terms of Use" that further discusses external websites, and is followed by the reiterated warning that VSP is not responsible for the privacy practices employed by such sites. *See id*.  The "Privacy Notice" contains prefatory language describing how VSP handles PHI, *see id*., and is identical to the webpage that loads if a website visitor clicks on the hyperlink labeled "HIPAA Privacy Policy" appearing on the menu at the bottom of each page.  *See* Ex. A.

Section III(a)(ii) of VSP's "Privacy Notice" discusses "Third Party Channel Partners," which are described as entities with whom VSP partners to deliver complementary or supplemental services to online customers.  *See* Eyeconic Privacy Notice ("Priv. Not."), Sec. III(a)(ii), https://www.eyeconic.com/hipaa.html (last visited Dec. 3, 2019) (attached as Exhibit C).  The "Virtual Try-On" tool is specifically identified as an example of such service.  *See id*.  According to VSP, the third-party channel provider that is responsible for the "Virtual Try On" tool (Ditto) is the entity collecting customer information (not VSP).  *See id*.  The "Privacy Notice" goes on to state that customers have a choice as to whether to provide information to Ditto, and that as a result, VSP will not be responsible for either information provided to Ditto, or legal issues arising in connection with Ditto's compliance with applicable privacy or security practices.  *See id*.

Further, a hyperlink from Section III(a)(ii) of VSP's "Privacy Notice" to Ditto's current privacy policy is provided for customers' convenience.  *See* Ditto Privacy Policy ("Ditto Priv. Pol."), https://www.ditto.com/privacy-policy (last visited Dec. 3, 2019) (attached as Exhibit D). Ditto's privacy policy is BIPA-compliant.  Indeed, in addition to a release, *see* 740 ILCS 14/15(b)(3), BIPA requires only that a private entity:  (1) inform the consumer that biometric information is being collected, *see* 740 ILCS 14/15(b)(1); and (2) inform the consumer of the

5

purpose and length of time for which biometric information will be retained. *See* 740 ILCS 14/15(b)(2). Ditto's privacy policy informs those who use the "Virtual Try On" tool of the exact biometric information that may be collected during the use of the application. *See* Ex. D at 4-5. Ditto's privacy policy also specifies a retention schedule for such information (which is only held for as long as necessary to provide a consumer with access to the "Virtual Try On" tool). *See* Ex. D at 7. In other words, biometric information is deleted by Ditto when consumers cease using the "Virtual Try On" application – which occurs automatically when a user exits VSP's website. *Id.*

**D.     The "Virtual Try On" Tool is Surrounded on Both Sides by the "Terms of Use" and the "Privacy Notice"**

Online customers who wish to purchase retail eyeglasses from VSP can use Ditto's application to provide a photo-based rendering of their appearance in a specific pair of retail frames. *See* Compl. ¶ 6. To use Ditto's "Virtual Try On" tool prior to purchasing eyeglasses, customers begin in one of two locations on the VSP website. First, customers can access the "Virtual Try On" tool as a hyperlink from the same menu at the bottom of each page that provides access to the "Terms of Use" and the "Privacy Notice." *See* Ex. A. Alternatively, customers can follow a hyperlink located next to the summary information for certain pairs of eyeglasses on the site. *See, e.g.*, Eyeconic.com (Image Capture), https://www.eyeconic.com/eyewear/eyeglasses (last visited Dec. 3, 2019) (attached as Exhibit E). Each photograph and corresponding image of a particular pair of eyeglasses appearing on VSP's website features the "Terms of Use" and the "Privacy Notice" hyperlinked at the bottom of each browsable page. *See* Ex. A.

Although Ditto's application (when launched) does not feature a link to the "Terms of Use" or the "Privacy Notice" while customers' photos are being taken, the resulting renderings subsequently return the consumer to VSP's website, where these hyperlinks once again appear on the bottom of each page. *See* Ex. A. In addition, under each photo of the customer "wearing" a

particular pair of virtual eyeglasses, a "Delete Photo" button appears that allows the consumer to purge this image from the site. The "Privacy Notice" does not indicate that VSP keeps or maintains the data that is collected by the Ditto application. In fact, the "Privacy Notice" emphasizes that it is Ditto (not VSP) that collects and captures this information. *See* Ex. C, Sec. III(a)(ii).

### III. <u>ARGUMENT</u>

VSP's status as a "provider of services" under HIPAA means that any PHI collected for purposes of healthcare treatment, payment, or operations is specifically excluded as an available basis for a private right of action under BIPA. Yet even if the Court finds that BIPA is not preempted by HIPAA, the "Terms of Use" on VSP's website still required Plaintiff to waive any and all claims or causes of action she could have asserted against VSP – including those arising under BIPA. The "Privacy Notice" incorporated into the "Terms of Use" further advised that it was Ditto (not VSP) that would be collecting information through the use of the "Virtual Try On" tool, and that under no circumstances would VSP be responsible to the consumer for the collection or storage of such information by Ditto or any third party. For each of these reasons, the Court should dismiss Plaintiff's class action complaint with prejudice under Rule 12(b)(6).

### A.   **Plaintiff's BIPA Claim is Preempted by HIPAA**

VSP is a healthcare company that markets and sells both corrective eyewear and contact lenses. *See* Compl. ¶ 3. The company is both a "covered-entity" under HIPAA, *see* 45 C.F.R. § 160.103, and a "provider of services" under the statute. *See* 42 U.S.C. § 1395x(u). By law, these designations authorize VSP to receive and retain any PHI that is collected for healthcare treatment, payment, or operations. *See* 45 C.F.R. § 164.306(a)(1). Under HIPAA, PHI is defined to include both "biometric identifiers," *see* 45 C.F.R. §164.514(b)(2)(i)(P), and "full face photographic images." *See* 45 C.F.R. §164.514(b)(2)(i)(Q). Although VSP sells both prescription and non-prescription eyewear, *see* Compl. ¶ 3, non-prescription eyewear is treated as a therapeutic

ophthalmic device by the United States Food and Drug Administration. *See* 21 C.F.R. § 886.5850. Accordingly, whether consumers visit VSP's website to purchase prescription or non-prescription eyewear, they do so in both instances to avail themselves of the benefit of healthcare treatment by a "provider of services" as that term is defined under HIPAA. *See* 42 U.S.C. § 1395x(u).

If this case continues beyond the dismissal phase, the nature, extent, manner of collection, and origin of the information elicited by the "Virtual Try On" tool will be disputed. For now, however, Plaintiff's complaint alleges that such information contains "biometrics," Compl. ¶ 3, and that such biometrics include "highly detailed geometric maps of the face." *Id*. ¶ 6. As noted above, both "biometric identifiers" and "full face photographic images" are designated as PHI under HIPPA, *see* 45 C.F.R. §164.514(b)(2)(i)(P-Q), and may be gathered and retained by a "provider of services" when engaged in healthcare treatment, payment, or operations. *See* 45 C.F.R. § 164.306(a)(1). These are the primary purposes of VSP's website. More importantly, a "provider of services" (such as VSP) is immune from a cause of action under BIPA where it collects this information in an effort to provide healthcare products and services to its customers.

The preemption of BIPA by HIPAA under these circumstances is straightforward. As indicated above, the Department of Health and Human Services has issued extensive regulations covering HIPAA, many of which cover the same subject matter as BIPA. *See* 45 C.F.R. §164.514(b)(2)(i)(P). HIPAA also contains an express preemption provision for state laws regarding PHI, *see* 45 C.F.R. §160.203, as well as unique protocols for the collection, use, and disclosure of PHI. *See* 45 C.F.R. §164.506. These regulations do not merely "touch upon" the subject matter of BIPA. *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993). On the contrary – the federal regulations at issue here "substantially subsume the subject matter of the relevant state law," *see id*., and thus expressly preempt BIPA when a "provider of services" under

8

HIPAA collects biometric information for healthcare treatment, payment, or operations. *See* 45 C.F.R. § 164.306(a)(1).

BIPA even acknowledges the federal statute (HIPAA) to which it defers. Under BIPA, a "biometric identifier" is defined as "a retina or iris scan, fingerprint, voiceprint, or scan of hand or face geometry." 740 ILCS 14/10. However, expressly *excluded* from this definition is "information captured from a patient in a health care setting or information collected, used, or stored for health care treatment, payment, or operations under the federal Health Insurance Portability and Accountability Act of 1996 [HIPAA]." *Id.* While Plaintiff may argue that the diverging definitions of "biometric identifier" under BIPA and HIPAA cannot be reconciled, the two statutes are easily read in concert. Where a "provider of services" under HIPAA collects alleged biometric information for the purposes of healthcare treatment, payment, or operations (such as delivering products or services to patients), that "provider of services" (VSP in this case) cannot be held liable for a violation of BIPA based on the act of collecting such information during treatment. Because this is Plaintiff's exact theory of recovery, her complaint should be dismissed with prejudice under Rule 12(b)(6). No court appears to have addressed this issue to date.[2]

## B.    Plaintiff was Bound by the "Terms of Use" on VSP's Website

Even if the Court determines that Plaintiff's BIPA claim is not preempted by HIPAA, the "Terms of Use" appearing on VSP's website still preclude her claim from going forward. To provide context, consumers using the internet can demonstrate their assent to the terms and conditions of a company's website by several methods. The two most common are "clickwrap" agreements and "browsewrap" agreements. In a "clickwrap" agreement, the webpage user

---

[2]    Although not addressing HIPAA, the Seventh Circuit very recently held that the federal Railway Labor Act ("RLA") preempts BIPA in certain employment contexts involving collective bargaining agreements. *See Miller v. Southwest Airlines Co.*, 926 F.3d 898, 903-04 (7th Cir. 2019).

provides consent to specific terms by clicking on an "accept" or "agree" button of some sort to proceed. *See* Ronald J. Mann, *Just One Click: The Reality of Internet Retail Contracting*, 108 Colum. L. Rev. 984, 990 (2008). Because they require affirmative action the part of the consumer, courts regularly uphold the validity of clickwrap agreements when challenged. *See id.*

Alternatively, "browsewrap" agreements do not require the user to expressly manifest his or her assent to terms and conditions. *See Southwest Airlines v. BoardFirst, LLC*, No. 06-CV-0891-B, 2007 WL 4823761, at *4 (N.D. Tex. Sept. 12, 2007). Instead, such agreements typically "involve a situation where notice on a website conditions use of the site upon compliance with terms or conditions, which may be included on the same page as the notice or accessible via a hyperlink." *Id.* A party to a browsewrap agreement therefore gives his or her consent to the terms and conditions of a website simply by using the site. *See id.* (citing *Pollstar v. Gigimania, Ltd.*, 170 F. Supp. 2d 974, 981 (E.D. Cal. 2000)). Because no affirmative action is required by the user, the validity of a browsewrap agreement is contingent on the degree to which the website provides reasonable constructive notice of the terms and conditions by which the user is alleged to be bound. *See Van Tassell v. United Mktg. Grp., LLC*, 795 F. Supp. 2d 770, 790-91 (N.D. Ill. 2011).

Here, the reasonable notice of the "Terms of Use" provided by VSP's website is as good as (or better than) the notice provided in other cases in which the validity of browsewrap agreements have been upheld. In *Hubbert v. Dell Corp.*, 835 N.E. 2d 113, 120 (Ill. 2005), the Illinois Supreme Court (applying Texas law) considered whether an arbitration provision appearing in the "Terms and Conditions of Sale" on the defendant's website was a valid and enforceable browsewrap agreement. Answering this question in the affirmative, the court observed that the terms at issue were visibly referenced several times during the browsing process, and were underscored using blue hyperlinks to emphasize the words "Terms and Conditions of

Sale" on multiple pages of the defendant's website. *See id*. at 118. Although *Hubbert* (unlike this case) involved an online purchase of goods in which a final statement about the "Terms and Conditions of Sale" was made at the time of checkout, the Illinois Supreme Court found that this statement "combined with making the 'Terms and Conditions of Sale' accessible online with blue hyperlinks was sufficient notice to the plaintiffs that purchasing . . . online would make the 'Terms and Conditions of Sale' binding on them." *See id*. at 122.

Similarly, in *PDC Laboratories, Inc. v. Hach Co.*, No. 09-1110, 2009 WL 2605270, at *2 (C.D. Ill. 2009), the Central District of Illinois (applying Colorado law) considered whether a browsewrap agreement was unconscionable because the disputed terms were not sufficiently conspicuous. Applying the standard that "a term in a contract is conspicuous if it is presented in a manner 'that a reasonable person against which it is to operate ought to have noticed it,'" *id*. (citing Colo. Rev. Stat. § 4-1-201(b)(1) (West 2009)), the court upheld the validity of the defendant's browsewrap agreement because hyperlinks to the terms contained in the agreement were available from multiple pages of the defendant's website, and were presented in "underlined, blue, contrasting text." *Id*. at *3. Although *PDC Laboratories* (like *Hubbert*) involved the purchase of an online good for which a final statement regarding the terms of sale was made, the Central District relied on the website layout and the similar observations in *Hubbert* to conclude that the terms of the disputed browsewrap agreement "were conspicuous enough to have been included and that such inclusion in the contract cannot be considered procedurally unconscionable." *Id*.

One court has even upheld the enforceability of a browsewrap agreement in the BIPA context. In *In re Facebook Biometric Privacy Litigation*, 185 F. Supp. 3d 1155 (N.D. Cal. 2016), the Northern District of California (applying Illinois law) found that one of three class action plaintiffs who had asserted a BIPA claim was subject to Facebook's user agreement based on his

assent to terms and conditions that were presented in a browsewrap format. Although the plaintiff was asked to click on a "Sign Up" button that purported to make him subject to the terms and conditions of the user agreement, he was not presented with a hyperlink that brought him to the terms and conditions of Facebook's website, nor was he directed to a separate page on which those terms and conditions appeared. *See id*. at 1166. While the facts of the *Facebook* case (based on the use of a "Sign Up" button) are more analogous to a traditional "clickwrap" agreement, the decision stands for the proposition that a plaintiff asserting a BIPA claim can indeed be subject to the terms and conditions of a defendant's website when presented in a browsewrap layout. *See id*.

VSP's website goes beyond *Hubbert*, *PDC Laboratories*, and *Facebook* in providing reasonable notice of its "Terms of Use." As explained above, the "Terms of Use" appear on *every navigable page* of VSP's website, and are presented on a black marquee that appears beneath any material viewed by the consumer (commercial or otherwise). *See supra* at 2-3. The hyperlinks to both the "Terms of Use" and the "HIPAA Privacy Policy" (*i.e.*, the "Privacy Notice") are contrasted in stark white against the black background of the marquee to ensure that consumers are directed to these links. *See* Ex. A. The links are also present both before and after consumers navigate away from the VSP-controlled portion of the site featuring the "Virtual Try On" tool (which is accessed using the same menu). *See supra* at 5-6. Under these conditions, there is no question that VSP's website contains a valid and enforceable browsewrap agreement that bound Plaintiff to the "Terms of Use" that governed her use of the site.

## C.      Plaintiff Waived All Claims and Causes of Action Against VSP

By accessing and using VSP's website, Plaintiff agreed to be bound by the "Terms of Use" that govern VSP's website. *See supra* at 9-12. The "Terms of Use" advise that if consumers do not agree to be bound by the terms and conditions in their entirety, they are not authorized to use

the website and should exit immediately. *See* Ex. B ¶ 1. The "Terms of Use" also warn that by accessing the website or by using any of the site's current or future services (including the "Virtual Try On" tool), consumers agree they have "read, understand, and accept to be bound by these Terms of Use." *Id.* As the complaint acknowledges, Plaintiff visited VSP's website and accessed the "Virtual Try On" tool. *See* Compl. ¶¶ 3, 17-19. Plaintiff does not allege that she attempted to leave the site or that her use of the "Virtual Try On" application was unwilling or compulsory.

As a result, Plaintiff is bound by the "Limitation of Liability" paragraph that appears in the "Terms of Use." *See* Ex. B ¶ 11. This paragraph requires Plaintiff (through her authorized use of the site) to waive any and all claims or causes of action against VSP, which includes her current claim against VSP under BIPA. *See id.* Indeed, the "Limitation of Liability" provision applies to any direct, "indirect," "special," "incidental," "consequential," "punitive," or any other form of damages or losses occurring from Plaintiff's use of the site, which includes its "service[s]," "product[s]," "information," or "functionalit[ies]." *See id.* This waiver applies whether injuries alleged by Plaintiff arise from "fault," "tort," "negligence," "strict liability," or "misrepresentation," *see id.*, and further obligates Plaintiff to indemnity and hold harmless VSP from "all liabilities, claims and expenses, including without limitation attorneys' fees" that arise from her use of the site or any of its "services, information, or products." *See id.* ¶ 13. Plaintiff has thus waived any liability she could possibly assert against VSP under BIPA.

**D.     Plaintiff was Advised that Ditto (Not VSP) Would Be Collecting Information Through Her Use of the "Virtual Try On" Tool**

Incorporated into VSP's "Terms of Use" is a "Privacy Notice" that is available by hyperlink directly from the "Terms of Use." *See id.* ¶ 9. Section III(a)(ii) of the "Privacy Notice" discusses "Third Party Channel Partners," which are entities with whom VSP partners to deliver complementary or supplemental services to online customers. *See* Ex. C, Sec. III(a)(ii). The

13

"Virtual Try-On" tool is specifically identified as an example of this practice. *See id*. Importantly, the "Privacy Policy" explains that the third-party channel provider that owns and administrates the "Virtual Try On" tool (Ditto) is the entity collecting customer information through the use of this application (not VSP). *See id*. This fact is fatal to Plaintiff's claim under BIPA.

To successfully assert a cause of action under BIPA, Plaintiff must allege that VSP took steps to "collect, capture, purchase, receive through trade, or otherwise obtain" an individual's biometric information. *See* 740 ILCS 14/15(b). Here, however, the "Privacy Notice" explains that it is Ditto – not VSP – that collects information via the "Virtual Try On" tool, meaning that Plaintiff cannot satisfy the fundamental element necessary to maintain her BIPA claim. *See id*. While Plaintiff will undoubtedly respond that her complaint accuses VSP of "collecting" this information in several paragraphs, such allegations must be "well-pleaded" to be accepted as true. *See McReynolds v. Merrill Lynch & Co., Inc.*, 694 F.3d 873, 885 (7th Cir. 2012). They are not. On the contrary, these mere conclusory allegations contradict the information appearing in the "Privacy Notice." *See id*. As such, the Court should disregard them for the purposes of assessing the soundness of Plaintiff's cause of action under BIPA. *See id*.

But even if the Court were to accept or assume a link between VSP and the data collected by Ditto, the "Privacy Notice" cautions that VSP will not be responsible for either customer information provided to Ditto, or legal issues arising in connection with Ditto's compliance with applicable privacy or security practices. *See* Ex. C, Sec. III(a)(ii). This warning is a reiteration of the declarations first appearing in the "Terms of Use," which discuss external websites and require consumers to agree that VSP is not responsible for the privacy or security practices employed by external websites or third-party applications. *See* Ex. B ¶ 9. These provisions are further confirmation that Plaintiff's cause of action under BIPA is waived and cannot proceed.

14

E.      **Ditto's Privacy Policy is BIPA-Complaint**

Finally, even if the Court determines that Plaintiff has not waived her claim against Ditto as a "Third Party Channel Provider" of VSP, *see* Ex. C, Sec. III(a)(ii), Ditto's privacy policy is BIPA-compliant.  Indeed, Ditto's privacy policy informs those who use the "Virtual Try On" tool of the exact biometric information that may be collected during the use of the application.  *See* Ex. D at 4-5.  In addition, Ditto's privacy policy specifies a retention schedule for such information – which is deleted as soon as consumers cease using the "Virtual Try On" tool.  *See* Ex. D at 7. Because the necessary consent to collect this information from consumers is already provided by the "Terms of Use" that govern VSP's website, *see supra* at 9-13, Ditto's privacy policy is BIPA-compliant, *see* 740 ILCS 14/15(b), and thus precludes Plaintiff from arguing that her rights have been violated (in any manner or by any party) under the statute.

## <u>CONCLUSION</u>

Pursuant to Federal Rule of Civil Procedure 12(b)(6), VSP respectfully requests the Court to dismiss the class action complaint filed by Plaintiff Vo in its entirety and with prejudice.


Dated:  December 3, 2019                    Respectfully submitted,

                                            *s*/ Brian Weinthal_____

                                            Christopher E. Kentra
                                            ckentra@burkelaw.com
                                            Brian Weinthal
                                            bweinthal@burkelaw.com
                                            BURKE, WARREN, MACKAY & SERRITELLA, P.C.
                                            330 N. Wabash Avenue
                                            Suite 2100
                                            Chicago, IL  60611
                                            Tel.: (312) 840-7142

                                            *Counsel for VSP Retail Development Holding, Inc.*